IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MERIDIAN TRANSPORTATION RESOURCES,
LLC, a Washington limited liability company,

                 Plaintiff,

     v.

MAGIC CARRIER RESOURCES LLC, an
Oregon limited liability company; and NIKOLAY
YUZKO, an individual,

                 Defendants.

CV-06-820-ST

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Meridian Transportation Resources, LLC ("MTR Western"), a Washington

limited liability company, alleges the following six claims against defendants, Magic Carrier

Resources, LLC ("Magic Carrier"), an Oregon limited liability company, and one of its

members, Nikolay Yuzko:

Claim One: Trademark infringement, trade dress infringement, unfair competition, and false designation of origin under 15 USC § 1125(a);

Claim Two:  False advertising under 15 USC § 1125(a);

Claim Three:  Common law trademark, trade dress, and trade name infringement;

Claim Four:  Unfair and deceptive trade practices under ORS 646.605-.656;

Claim Five:  Cyber piracy under 15 USC § 1125(d); and

Claim Six:  Trademark dilution under ORS 647.107.

MTR Western does not seek an award of damages, but instead seeks only a permanent injunction and an award of attorney fees.

 Upon the filing of this action on June 9, 2006, MTR Western also filed a motion for a temporary restraining order and an order to show cause for a preliminary injunction.  On June 14, 2006, defendants stipulated to a preliminary injunction.  Defendants deny all claims and assert a counterclaim for attorney fees.

The parties waived a jury and consented to trial and entry of judgment by a Magistrate Judge.  Prior to trial, defendants stipulated to entry of a permanent injunction and MTR Western withdrew all of its common law claims.

Evidence was received by the court on August 21, 2007.  At the conclusion of the trial, the Court granted defendants' motion to dismiss Nikolay Yuzko as a party.  These Findings of Fact and Conclusions of Law address only which party is the prevailing party and whether any party is entitled to an award of attorney fees under 5 USC § 1117(a) or ORS 646.638.

///

///

2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

**FINDINGS OF FACT**

**I.    MTR Western**

MTR Western commenced doing business as a charter motor coach transportation
company in Oregon in May, 2003, and registered "MTR Western" as an Assumed Business
Name in the state of Oregon on July 2, 2003.  Darren Berg is a member of MTR Western.

MTR Western operates about 30 motor coaches based in Portland, Oregon, and is the
second-largest charter motor coach carrier in the state of Oregon.  It uses the following trade
dress throughout Oregon and the Pacific Northwest to identify its services: a solid gold painted
motor coach with a decal on its side, close to the windows, that reads MTR Western in its
stylized trademark format.  This stylization includes "MTR" in bold and italic font, and
"Western" in cursive font, accompanied by a logo with two swirls in contrasting colors ("Swirl
Design logo") close to the driver's side window of the motor coach.  The Swirl Design logo and
the MTR Western (Stylized) trademark are colored in orange, black, and white.  The trade dress
also includes an operating authority decal which includes the phrase "PROUDLY OWNED
AND OPERATED BY" preceding the operating authority information required by the U.S.
Department of Transportation ("Operating Decal").  The Operating Decal is stamped on each
motor coach in a simple black font in all capital letters. The names of the cities in which the
motor coach operates is part of this decal in the same font, but in capital and lower-case letters,
separated by a slash ("/").

MTR Western has not filed any federal or state registration of any of the marks at issue in
this litigation.

To help consumers identify its services and distinguish them from those of its competitors, MTR Western maintains high levels of customer support, quality, and safety. MTR Western spends numerous hours training its drivers to drive safely and smoothly, own top quality motor coaches that are regularly maintained, has a reputation of rarely experiencing road failures, and is an industry leader in environmental responsibility. As a result, the MTR Western trade dress has acquired value and goodwill and has become distinctive and well-known to the consuming public as identifying and distinguishing MTR Western's services.

II.    **Formation of Magic Carrier**

Two Ukranian brothers, Nikolay and Vitaly Yuzko, with little sophistication in business matters, decided to start a charter bus company in Oregon. Vitaly Yuzko had seen an article about Berg and his charter bus company in Seattle and wished to emulate his success. The Yuzkos proceeded to buy one used white Prevost motorcoach which is the same model used for the majority of MTR Western's fleet.

To learn more about the business, the Yuzko brothers visited MTR Western's facility in Portland and talked to its Sales Manager, Margaret Usher ("Usher"). Usher shared some information with the Yuzkos about where to obtain service and maintenance, discussed using them as a possible subcontractor, but declined their request to park their bus there. At the facility, the Yuzkos saw the MTR Western Marks and its motor coaches adorned with the MTR Western Trade Dress.

The Yuzkos then formed Magic Carrier, became its members, and filed its Articles of Incorporation in the State of Oregon on April 19, 2006. Nikolay Yuzko liked the name "Magic" which he had used for his first company, Magic Wheels. The Yuzkos choose the other words

("Carrier" and "Resource") as descriptive of the business and also with the intent to adopt a

name similar, but not identical to, MTR Western.

Magic Carrier added its operating decal on one side of its bus with the same tag line used

by MTR Western ("PROUDLY OWNED AND OPERATED BY") preceding the operating

authority information required by the U.S. Department of Transportation.  Similar to MTR

Western, Magic Carrier's operating decal was stamped in black capital letters, although in a

different font, and included the ICC number.  Although other busses also use the same or similar

tag lines and ICC number, the Yuzkos intended to adopt an operating decal name similar, but not

identical to, MTR Western's Operating Decal.

III.    **Contact Between the Parties**

Magic Carrier solicited business with Amtrak by distributing a flyer.  Amtrak then hired

Magic Carrier for a trip from Portland to Seattle.  MTR Western and another charter bus

company also have contracts with Amtrak to provide emergency services.  On or about May 15,

2006, Berg saw Magic Carrier's bus parked across the street outside the Seattle Amtrak station

and thought that MTR Western was using an unpainted coach.  He viewed the operating decal

through binoculars and realized his confusion.  Believing that Magic Carrier had copied MTR

Western's Operating Decal, he approached with the driver and asked to speak to the owner.  The

driver, Vitaly Yuzko, did not identify himself as the owner.  Berg gave the driver his business

card and asked him to have the owner contact him.  When Vitaly Yuzko returned Berg's call the

next day, Berg told him that he had infringed on his intellectual property by copying MTR

Western's Operating Decal and must come up with something else.  Vitaly Yuzko agreed to do

so.

Magic Carrier changed its operating decal within a day.  When changing the operating decal, the Yuzkos felt that Magic Carrier's name was too long to put on the side of the bus and for a website and shortened the name to "MCR-West" which they subsequently registered as an Assumed Business Name in the State of Oregon on May 26, 2006.

Magic Carrier's agent registered the domain name "mcr-west.com" and developed a website (previously located at http://www.mcr-west.com) for use in connection with Magic Carrier's services.  That website advertised Magic Carrier's driver training, safety precautions, quality of motor coaches, and numerous types of vehicles, all of which were presented to appear substantially similar to MTR Western's services and coaches.  The website contained several misrepresentations, including that Magic Carrier "is the leading provider of passenger ground transportation services in the Northwest United States" has "Vans, MiniBuses, Motor Coaches and Para-Lift Vehicles" (implying more than the one coach, minibus, and para-lift vehicle leased by Magic Carrier), has staff "whose experience is unsurpassed in the passenger ground industry," and "maintains exceptional safety ratings with the US Federal regulatory angencies [*sic*]."

After the first conversation with Berg, the Yuzkos developed a business card for Magic Carrier with the assistance of a friend.  The business card contained the name MCR-West in stylized script above Magic Carrier's full name in block print, the street address and telephone numbers, web site address, as well as a photograph of the coach.  Using Photoshop, their friend inserted an image of the white coach in front of the Vatican and the Eiffel Tower and dropped a logo and the name MCR-West onto the image of the coach.  The logo is common clip art and consists of a swirl design in gold and black  The swirl design is similar to MTR Western's Swirl

Design logo, but is more linear and without complete circles. Swirl designs are common on privately owned motor coaches, but not on charter motor coaches. Although shown on the business card, the logo was never painted onto the coach. The Yuzkos made 50 business cards to try out.

Berg received a call from MTR Western's Director of Maintenance reporting that a Portland paint shop had received a request from a new Portland company with a Prevost coach for a quote using MTR Western's paint codes. Berg called Vitaly Yuzko again and told him not to paint his coach gold. After an argument, Vitaly Yuzko agreed.

Usher next saw the Yuzkos at a Portland Oregon Visitors Association meeting. The Yuzkos introduced themselves and said that Magic Carrier would be providing services similar to MTR Western. After the meeting, Usher reported this encounter to Berg. Berg then called Vitaly Yuzko for a third time to demand that a change in the trade name. They again argued, with Berg making threats to squash Magic Carrier "like a bug." Vitaly Yuzko agreed to go in a different direction, requesting at least a week to do so, but Berg insisted on immediate compliance.

In late May 2006, Usher attended a meeting of the Oregon Travel and Tour Alliance. Nikolay Yuzko also attended that meeting, introduced Magic Carrier and passed out five to 10 business cards. A tour planner at the meeting, Harmony Geimer ("Geimer"), was excited to see a new charter motor coach company in Oregon and knew that it had no connection with MTR Western. Usher obtained one of Magic Carrier's business cards. Being very concerned about the similar name which would be listed above MTR Western in the alphabet and similar livery on the coach, she provided the card to Berg.

7 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Magic Carrier placed a newspaper advertisement on May 28, 2006, which used the name MCR-West Company at the top and misrepresented that it owned a "[l]arge fleet of new, well maintained Motor Coaches and Mini Buses."  In response to that ad, Geimer called and met with the Yuzkos and requested a bid for services for one of her clients.

Berg called Vitaly Yuzko again on Friday, June 2, 2006, and left a voice mail message. Vitaly Yuzko returned the call on Monday, June 5, 2006.  Again the two argued, with Berg making threats and Vitaly Yuzko insisting he was doing nothing wrong.  Although Vitaly Yuzko again agreed to change the name, Berg did not believe him and contacted his attorneys.

In response to Berg's telephonic threats and claims of infringement, Vitaly Yuzko told his brother to stop everything and change the name.  On June 8, 2006, Magic Carrier registered a new assumed business name, NW Eagles.  MTR Western did not send Magic Carrier a cease and desist letter, but instead filed this lawsuit the next day.

Upon being served with the lawsuit, Magic Carrier sought legal counsel and immediately destroyed its remaining business cards, took down its website, and stipulated to a preliminary injunction which the Court signed on June 14, 2006.

## CONCLUSIONS OF LAW

**I.      Jurisdiction**

This Court has original jurisdiction over this action pursuant to 28 USC § 1331 and 15 USC §§ 1116 and 1121.  This Court has supplemental jurisdiction over the claims for trademark infringement, trade name infringement, unfair competition, dilution, false advertising, and unfair and deceptive trade practices under the laws of the State of Oregon pursuant to 28 USC § 1367.

**II.**    **Prevailing Party**

For purposes of the remaining issue concerning attorney fees, this court need only consider MTR Western's claims of infringement under the Lanham Act and the Oregon Unlawful Trade Practices Act.

The Lanham Act, 15 USC § 1125(a)(1), provides as follows:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, . . . which— (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The substantive provisions of ORS 646.608(1)(b) and (c) make it an unlawful trade practice to cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of real estate, goods or services" or "as to affiliation, connection or association with or certification by, another."

**A.**    **Use in Commerce**

"Commerce" is defined in the Lanham Act as "all commerce which may lawfully be regulated by Congress." 15 USC § 1127. "Use in commerce" is defined as:

> [T]he bona fide use of a mark in the ordinary course of trade . . . for purposes of th[e Trademark Act], a mark shall be deemed to be in use in commerce— . . . (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 USC § 1127.

Magic Carrier's use of the trademarks MCR-West and the swirl design logo on their website, in advertising, and on their business cards constitutes "use in commerce" under 15 USC § 1125(a).  *See Miller Brewing Co. v. Carling O'Keefe Breweries of Canada Ltd.*, 452 F Supp 429 (WDNY 1978) (finding that use of a trademark in advertising alone can establish a cause of action for trademark infringement).

### B.    Likelihood of Confusion

In the Ninth Circuit, the following eight non-exclusive factors are used determine if confusion between related goods or services is likely:  (1) strength of the plaintiff's trademark; (2) proximity of the services; (3) similarity of the parties' trademarks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of services and degree of care likely to be exercised by purchasers; (7) defendant's intent in selecting the trademark; and (8) likelihood that the parties will extend their product lines.  *AMF, Inc. v. Sleekcraft Boats*, 599 F2d 341, 348 (9th Cir 1979).

### 1.    Strength of Trademark

Because the MTR Western Marks do not suggest or describe motor coach or transportation services, they are not suggestive, descriptive, or generic for the services offered. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 US 763, 768-69 (1992).  Arbitrary and fanciful marks are inherently distinctive and thus strong.  *Sleekcraft*, 599 F2d at 349.

MTR Western's Marks are inherently distinctive and strong.  MTR Western has gone to great lengths to help consumers identify its services and distinguish them from those of its competitors.  On account of these efforts and the use, promotion, and publicity, the MTR Western Marks and Trade Dress have acquired value and goodwill, and have become distinctive

and well-known to the consuming public as identifying and distinguishing MTR Western's services.

### 2.    Proximity of Services

Both parties offer the same services, namely motor coach carrier services in Oregon.

### 3.    Similarity of Trademarks

Similarity of trademarks must be tested on three levels:  sight, sound, and meaning. *Sleekcraft*, 599 F2d at 351.  Here, the parties' marks are similar in all respects.

#### a.    Sight

The first words of the marks, MTR Western and MCR-West, differ only in one letter ("T" and "C").  The second words differ only by three letters and are variations of the same word ("Western" and "West").  To the eye, the marks at issue here are similar.   In addition to the slight variations in letters, Magic Carrier's stylizations are likewise very similar in sight.  Both parties use orange (or a dark yellow similar to orange) and black to stylize the words as well as similar logos.

#### b.    Sound

There is only a slight difference in the sound of "MTR Western" and "MCR-West." This slight difference is not enough to avoid confusion.

#### c.    Meaning

Both marks contain a set of three letters used as an acronym for the company's full name, followed by a designation of geographic/regional location.  The acronyms in this case differ by only one letter and are followed by "Western" and "West," which have the same meaning.

///

11 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

   **d.**  <u>**Evidence of Actual Confusion**</u>

  The evidence is conflicting as to actual confusion.  There has been one instance of actual confusion in which an MTR-Western customer called MCR-West looking for an item left on a bus.  In contrast, Geimer, a tour operator, was not at all confused by MCR-West.

   **e.**  <u>**Marketing Channels Used**</u>

  The parties offer their services in the same marketing channels.  Both parties advertise their services on an internet website and generally to customers in the West and Northwest, including Oregon.

   **f.**  <u>**Type of Services and Degree of Care**</u>

  The parties offer identical services.  Although some consumers of MTR-Western's services, such as professional sports teams, may exercise a higher degree of care, others, such as individual groups and tourists, are likely to be unfamiliar with their options and exercise a much lower degree of care in choosing a service provider.

   **g.**  <u>**Intent in Selecting Trademark**</u>

  The Yuzkos were aware of the MTR Western Marks and Trade Dress before adopting their marks and knowingly adopted similar marks.  They also continued to use their marks even after several verbal requests by Berg that they stop doing so.

   **h.**  <u>**Likelihood that the Parties Will Extend Their Product Lines**</u>

  Because the parties are already in direct competition, this factor is inapplicable.

   **4.**  <u>**Conclusion**</u>

  Most of the factors weigh in favor of a finding of likelihood of confusion.  Therefore, Magic Carrier's use of its marks in commerce infringed MTR Western's trademarks under 15

USC § 1125.  For the same reasons as set forth above, Magic Carrier has violated ORS

646.608(1)(b) and (c).  Thus, MTR Western is the prevailing party for purposes of the following

analysis.

## III.    **Attorney Fees**

Under the Lanham Act, the court has discretion in an "exceptional case" to award

reasonable attorney fees to the prevailing party.  15 USC § 1117.  An "exceptional" case is one

in which the defendants' acts of infringement can be characterized as malicious, fraudulent,

deliberate, or willful.  *See* Senate Rep. No. 93-1400, 93rd Cong. 2d Sess. 2 (Dec. 17, 1974),

*reprinted in* 1974 USCCAN 7132, 7133; *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F2d 1400,

1409 (9th Cir), *cert denied*, 510 US 815 (1993).  In the Ninth Circuit, a finding that a case is

"exceptional" does not require egregious culpability, such as bad faith or fraud.  *Earthquake

Sound Corp. v. Bumper Indus.*, 352 F3d 1210, 1217 (9th Cir 2003).

The Yuzkos intended to adopt trademarks and trade dress similar to MTR Western and

were warned by Berg of possible infringement.  After the first warning by Berg concerning the

operating decal, they did change the operating decal.  However, they then proceeded to develop a

trade name, business cards and a website which infringed on the trade rights, trade name, and

trade dress of MTR Western.  Berg was unaware that Magic Carrier had changed its operating

decal, but after seeing its business card, communicated his concern about infringement to the

Yuzkos.

Unfortunately Berg approached the Yuzkos in a very threatening manner and gave them

very little time to comply.  At most, only three weeks passed after Magic Carrier first distributed

its business cards and MTR Western filed suit.  During that time, Magic Carrier's sole motor

coach remained white.  The Yuzkos passed out only a handful of business cards and did try to remedy the situation when they began to realize how upset Berg had become.

When other courts have awarded fees for an "exceptional case," the facts are much more egregious than here.  In *Earthquake Sound Corp.*, 352 F2d at 1218, there was "ample evidence of actual confusion" and defendant reneged on an agreement to stop using the mark.  In *AANP v. American Ass'n of Naturopathic Physicians*, 37 Fed Appx  893, 894 (9th Cir 2002), the evidence of was "especially egregious" because defendant incorporated itself under the name of the trademark owner after the owner's corporate license in Oregon inadvertently lapsed, conducted a campaign touting its takeover of the trademarked corporate name, mailed a solicitation regarding the new corporation, and lobbied state legislatures under the trademark.  In *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F3d 814, 825 (9th Cir 1996), the defendant infringed in order to cause confusion and obstruct plaintiff's pursuit of its environmental agenda.  In *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F2d 1001, 1027 (9th Cir 1985), *cert denied*, 474 US 1059 (1986), the record contained substantial evidence of deliberate infringement by the defendant by passing off an imitation product, including continued infringement in violation of injunction.  In *Sealy, Inc. v. Easy Living, Inc.*, 743 F2d 1378, 1384 (9th Cir 1984), the defendant deliberately intended to deceive consumers and take advantage of Sealy's brand identification. In *Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.,* 692 F2d 1272 (9th Cir 1982), the defendants contracted with a third party to produce counterfeit Playboy and Rabbit Head insignias and then sold them as genuine Playboy products.  In upholding the award, the court noted that the counterfeiters' actions "cannot be justified as either a reasonable attempt to

14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

develop their own trademark or as the result of innocent confusion concerning the existence of

the well recognized [Playboy] trademarks." *Id* at 1276.

In contrast, Magic Carrier engaged in none of these same activities giving rise to an

"exceptional case" supporting the award of attorney fees.  Instead, when starting their new

business, the Yuzkos attempted to develop their own trademark.  They did not first consult a

lawyer and, as novice businessmen who immigrated from another country, apparently knew little

about the law of trademark infringement.  Although they clearly copied portions of MTR

Western's Marks and Trade Dress, they did so in order to follow the successful example of MTR

Western.  There is no evidence that the Yuzkos were attempting to capitalize on the strength of

MTR Western's dominant mark in order to steal its customers.  After all, Magic Carrier had only

one unpainted coach which posed no serious competition to the far larger and well-known MTR

Western.  In addition, the Yuzkos did not attempt to capitalize on any confusion with MTR

Western when introducing their new company to potential customers in the tourism industry.

Berg was rightfully concerned about the potential of Magic Carrier to grow and become

more competitive, potentially causing confusion with some of its customers.  But he acted

hastily, first by making threats which did little to persuade Magic Carrier to cooperate and then

by filing suit only a few weeks after learning about Magic Carrier's existence.  Magic Carrier

made a reasonable effort to respond to his first warning by changing its operating decal to be less

similar to MTR Western's Operating Decal.  Rather than confirming that Magic Carrier had

taken some action to avoid confusion, Berg assumed, based solely on the business card, that

Magic Carrier could not be trusted.  Had Berg approached Magic Carrier less aggressively or had

MTR Western's lawyers first sent a cease and desist letter to Magic Carrier explaining trademark

infringement, then this lawsuit would likely have been avoided.  MTR Western gave Magic Carrier too little time to comply before engaging in litigation.

This is a straight-forward case of infringement without any extenuating circumstances to make the case exceptional.  Out of ignorance, the Yuzkos simply failed to select a sufficiently unique trademark to avoid all possible likelihood of confusion with MTR Western.  *See Competition Specialties, Inc. v. Competition Specialties, Inc.,* 87 Fed Appx 38, 42 (9th Cir 2004) (declining to award attorney fees, finding that a case was not exceptional, notwithstanding the jury's finding that defendant knowingly and intentionally infringed the plaintiff's mark); *Lindy Pen Co.*, 982 F2d at 1409-10 (affirming district court's denial of attorney fees where infringement not intentional and nothing else made case exceptional); *International Olympic Committee v. San Francisco Arts & Athletics*, 781 F2d 733, 738-39 (9th Cir 1986) (denying an award of attorney fees where defendants could have "reasonably doubted" that their proposed usage of the word "Olympic" would not be infringing).

Particularly compelling here is that MTR Western has suffered no financial harm attributable to any confusion and, in fact, seeks no damages.  Courts generally deny an award of attorney fees to a prevailing plaintiff who has suffered no damages.  *See Hindu Incense v. Meadows*, 692 F2d 1048, 1052 (6th Cir 1982); *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F2d 1106, 1107 (10th Cir 1982); *Burger King Corp. v. Metro Club, Inc.*, 208 USPQ 293, 305-07 (ED Mich 1980); *Health Ind., Inc. v. European Health Spas*, 489 F Supp 860, 869 (D SD 1980).

Although MTR Western is the prevailing party and entitled to a permanent injunction prohibiting Magic Carrier from using MTR Western's Marks and Trade Dress without permission, this is not an exceptional case for which an award of attorney fees is appropriate.

16 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Under ORS 646.608(5), "the prevailing party may be awarded reasonable attorney fees." This leave the award of attorney fees within the discretion of the court.  As explained above, this court concludes that the filing of this lawsuit was unnecessary to avoid damage to MTR Western by Magic Carrier's infringement activities.  Therefore, an award of attorney fees to MTR Western as the prevailing party on its claim for violation of ORS 646.608(1)(b) and (c) is not warranted.

DATED this 10th  day of  September, 2007.


/s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge